```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA

 5   VERSUS                  CRIMINAL NO. 3:22-cr-00108-CWR-ASH-1

 6   DARRIUS CHARLES MCELROY                          DEFENDANT

 7


 8                      MOTIONS PROCEEDINGS
 9          BEFORE THE HONORABLE CARLTON W. REEVES,
              UNITED STATES DISTRICT COURT JUDGE,
10                       JUNE 11, 2024,
                       JACKSON, MISSISSIPPI
11


12


13


14   APPEARANCES:

15   FOR THE GOVERNMENT:    MATTHEW WADE ALLEN, ESQ.

16   FOR THE DEFENDANT:     E. CARLOS TANNER, III, ESQ.

17


18


19


20


21

     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

**TABLE OF CONTENTS**

Style and appearances.......................................  1

WITNESS:  TARIK WILLIAMS

Direct by Mr. Allen.......................................  6

Cross by Mr. Tanner.......................................  11

Redirect by Mr. Allen.....................................  45

Examination by the Court..................................  46

Defendant's Exhibit 1-2 entered in evidence...............  46

Continued redirect by Mr. Allen...........................  53

Recross by Mr. Tanner.....................................  53

Defendant's Exhibit 3 entered in evidence.................  59

Defendant's Exhibit 4 entered in evidence.................  62

Court Reporter's Certificate..............................  81

**IN OPEN COURT, JUNE 11, 2024**

1

2

3     THE COURT:  You may be seated.

4     Good morning.  First of all, I do apologize to the

5 parties for my delay.  I sincerely apologize.

6     Is the Government ready to call the case?

7     MR. ALLEN:  Yes, Your Honor.

8     THE COURT:  You may proceed.

9     MR. ALLEN:  Matt Allen for the United States.

10     We are here in United States of America versus Darrius

11 Charles McElroy.  This is Criminal Number 3:22-cr-108.  The

12 defendant, Mr. McElroy, is present in the courtroom along

13 with his counsel, the Honorable Carlos Tanner.

14     THE COURT:  Thank you.

15     Mr. McElroy, you're here with your lawyer, Mr. Tanner.

16 Are you on any medication today?  I know -- I see that you

17 are in the custody of the United States Marshal; is that

18 correct?

19     THE DEFENDANT:  Yes, sir.

20     THE COURT:  Speak up.

21     THE DEFENDANT:  Yes, sir.

22     THE COURT:  All right.  Are you on any medication

23 today?

24     THE DEFENDANT:  No, sir.

25     THE COURT:  Are you required to be on any medication?

```
 1          THE DEFENDANT:  No, sir.
 2          THE COURT:  Is there anything interfering with your
 3     ability to understand me today?
 4          THE DEFENDANT:  No, sir.
 5          THE COURT:  Is there anything interfering with your
 6     ability to consult and communicate with your lawyer should
 7     you need to today?
 8          THE DEFENDANT:  No, sir.
 9          THE COURT:  Throughout these proceedings today, if you
10     need to speak with your lawyer, you may do so.  Do you
11     understand that?
12          THE DEFENDANT:  Yes, sir.
13          THE COURT:  And you may speak with him outside of the
14     presence of the persons in this courtroom if you need to at
15     any point in time.  Do you understand that?
16          THE DEFENDANT:  Yes, sir.
17          THE COURT:  All right.  Are the parties ready to
18     proceed?
19          MR. ALLEN:  Yes, Your Honor.
20          THE COURT:  It's my understanding that we're here
21     for -- on the defendant's motion to suppress certain
22     evidence in this case.
23          MR. ALLEN:  Correct, Your Honor.
24          THE COURT:  All right.  Are we ready to proceed, then?
25          MR. TANNER:  Yes, Your Honor.
```

```
1            MR. ALLEN:  Yes, Your Honor.

2            THE COURT:  All right.  Who is your first witness?

3            MR. ALLEN:  Yes, Your Honor.  The --

4            THE COURT:  Oh, I'm sorry.  Is there anything we need

5      to take up before we --

6            MR. TANNER:  The defense invokes the rule, Your Honor.

7            THE COURT:  The rule is invoked.  If there are any

8      persons who are witnesses in this matter, they must return

9      to the witness room, and I will ask the parties to sort of

10     make sure you are aware whether or not any of your witness

11     come in during the testimony.

12            MR. ALLEN:  Yes, Your Honor.

13            The Government calls Sergeant Tarik Williams of the

14     Jackson Police Department.

15            (Whereupon, the witness was placed under oath.)

16            THE COURT:  Mr. Williams, before you is a microphone.

17     I ask that you speak loudly and clearly into it.  Please

18     allow the lawyers to finish their questions before you begin

19     to speak so that the two of you will not be speaking at the

20     same time.  Make sure all your responses are verbal.  If you

21     are going to nod or shake your head, give me a "yes" or "no"

22     at the time.  And please speak at a pace at which the court

23     reporter can keep up with you, because she has to take down

24     everything that is being said.

25            To start this process off, will you please state and
```

1    spell your name.

2        THE WITNESS:  My first name is Tarik, T-A-R-I-K, last

3    name Williams.

4        THE COURT:  How do you spell Williams?

5        THE WITNESS:  W-I-L-L-I-A-M-S.

6        THE COURT:  Okay.  Thank you.

7        You may proceed.

8                        **TARIK WILLIAMS,**

9            **having been first duly sworn, was examined and**

10   **testified as follows...**

11                     **DIRECT EXAMINATION**

12   **BY MR. ALLEN:**

13   Q.   Sergeant Williams, would you tell the Court what your

14   professional role is.

15   A.   I'm the narcotics supervisor and ceasefire supervisor for

16   the Jackson Police Department.

17   Q.   And what is your rank with the Jackson Police Department?

18   A.   Sergeant.

19   Q.   How long have you been with JPD?

20   A.   15 years.

21   Q.   Would you tell the Court where you were on July 31st of

22   2021.

23   A.   I was at the intersection of Ridgeway and Medgar Evars

24   Boulevard.

25   Q.   And where were you at that intersection?

1  A.   There's a gas station right at that intersection, right

2  at the corner of that intersection.  I don't know the name of

3  the gas station, but that's where I was sitting, stationary

4  monitoring traffic.

5  Q.   Were you stationary in your vehicle?

6  A.   I was.

7  Q.   I'm trying to paint a picture here for the Court of where

8  your car was situated.  Would you have been on the east or

9  west side of Medgar Evars?

10  A.   I was on the east side.  My vehicle was facing west, and

11  I could see traffic from -- coming from north to south and the

12  traffic coming from west towards my direction east.

13  Q.   Would you tell the Court about what you observed of a

14  vehicle on which you conducted a traffic stop.

15  A.   On that date, while sitting, like I said, facing Medgar

16  Evars, I saw a white in color vehicle coming to the

17  intersection of Coleman Avenue and Medgar Evars Boulevard.  As

18  the vehicle made a left turn crossing my path, I could see

19  through the windshield that the driver was not wearing a seat

20  belt.  He had a white shirt on, so it was very visible that he

21  didn't have a seat belt on.  Once the vehicle passed me, I

22  pulled out of the gas station, got behind it, turned my blue

23  lights on.  The vehicle continued to drive.

24        THE COURT:  Slow down just a little bit, please.

25        THE WITNESS:  Yes, sir.

1   BY MR. ALLEN:

2   Q.   Explain for the Court -- I want you to tell the Court

3   where Coleman Avenue was in relation to where you were parked.

4         THE COURT:  And if you know the spelling of that

5      street, tell me.

6         MR. ALLEN:  Coleman?

7         THE COURT:  If you know the spelling, go ahead.

8         THE WITNESS:  C-O-L-E-M-A-N.

9         THE COURT:  Oh, okay.

10  BY MR. ALLEN:

11  Q.   So as I appreciate it, you are parked on the east side of

12  Medgar Evars?

13  A.   Correct.

14  Q.   And as you are looking across Medgar Evars, where is

15  Coleman Avenue?

16  A.   From where I was parked, it's -- it's at an angle.  It's

17  not straight across, but it's kind of at an angle.  It kind of

18  offsets.

19  Q.   What was your field of vision into the front of the

20  vehicle that you observed?

21  A.   Well, once the vehicle started to travel coming from

22  Coleman, making the left turn, you could see the front of the

23  vehicle.  And once it begins to make the turn, that's when I

24  can make out that, okay, it's a Toyota.

25  Q.   Do I understand you to say that you could see through the

1  front windshield of the vehicle?

2  A.   Correct.  I could see -- the driver had a white shirt on,

3  and I could see that there was no seat belt on.

4  Q.   You were beginning to tell the Court how you had

5  initiated your siren and lights.

6  A.   Yes, sir.

7  Q.   Let's start there.  And tell the Court what happens after

8  you, I guess, pull out of Medgar Evars and initiate your

9  lights and siren.

10 A.   As I stated, I pulled on to Medgar Evars Boulevard once

11 the vehicle passed.  I turned my blue lights on.  I sounded my

12 siren.  I advised Detective Hull, who was in the area with me,

13 that a Toyota Avalon just passed me, the driver didn't have a

14 seat belt on.

15      I hit my siren, blue lights still on.  The vehicle passed

16 Rutledge Avenue, still not stopping, but he wasn't going at an

17 excessive speed.  We get to the intersection of Medgar Evars

18 and Liberty.  The vehicle --

19          THE COURT:  Medgar Evars and what?

20          THE WITNESS:  Liberty.

21          THE COURT:  Liberty.  Go ahead.  I'm sorry.

22 A.   And the vehicle continues to drive.  The vehicle turns on

23 to Sunset.  Hit my siren again.  The vehicle passes O Bannon.

24 I hit my siren again.  The vehicle comes -- it slows not to a

25 stop, but it slows down and turns on to Newport, and while I

1  am still behind the vehicle, I could see the driver moving

2  frantically inside the vehicle.  The vehicle pulls into the

3  driveway of 2857 Newport.

4  Q.  Could you identify who the driver was?

5  A.  Well, once we pulled into the driveway -- I pulled in

6  right behind him.  The driver door opened, the driver got out,

7  and I observed the driver as Mr. Darrius McElroy.  Well, a lot

8  of -- street-wise, the call him DC, but we were running an

9  investigation in reference to his possible ties with the

10  Butthead Gang.

11  Q.  I'll stop you there for purposes of what I'm asking you

12  about today, but do you recognize Mr. McElroy in the courtroom

13  today?

14       MR. TANNER:  We'll stipulate to identity, Judge.  This

15   is Mr. McElroy.

16       THE COURT:  All right.  It was stipulated.

17       MR. ALLEN:  And with that, Your Honor, and the issue

18   before the Court, I'll tender the witness at this time.

19       THE COURT:  Is that all?  Okay.  All right.

20       MR. ALLEN:  We're here -- yes, Your Honor.  The issue

21   is the propriety of the traffic stop.  I'll tender the

22   witness at this time.

23       THE COURT:  All right.

24       MR. TANNER:  May it please the Court?

25       THE COURT:  You may proceed.

**CROSS-EXAMINATION**

**BY MR. TANNER**

Q.    Detective Williams, was there anything distinctive that you had recognized before about this particular Toyota Avalon?

A.    Yes, sir.  The year prior, we were in the same area of Newport and O Bannon when one of our sergeants wanted to make contact with a vehicle that was -- it was during that time dealing with a drug transaction, the sergeant advised that it was a Toyota Avalon.  We pulled in and tried to make contact with the two individuals inside of it.  I could see two people sitting inside of it.  The passenger got out, fled on foot.  The driver at that time put the vehicle in reverse, and a vehicle pursuit ensued after that.

Q.    And that driver almost hit the passenger, right?

A.    Yes, correct.

Q.    And after the driver finally came to a stop, he ran into a house?

A.    I don't know.  He ran somewhere in the area.

Q.    Okay.  And we are going to come back to that.

      All right.  So the truth is, although you didn't say this on direct, you knew this vehicle long before you say you figured out that this was Darrius McElroy, right?

A.    Once it passed, looking at the discoloration -- I think it was a repainted door or the door was primed.

Q.    Which door?

```
1   A.    The passenger door.

2   Q.    Which passenger door?

3   A.    To the Toyota Avalon.

4   Q.    Front passenger door?

5   A.    Oh, front passenger door.  I'm sorry.

6   Q.    Okay.  So, now, you're saying that you're facing --

7   you're on the east side of Medgar Evars, right?

8   A.    Correct.

9   Q.    And you are facing west --

10  A.    Right.

11  Q.    -- on Medgar Evars, right?  You're looking across the

12  street, right?

13  A.    Correct.

14  Q.    And you say this car came at an angle kind of off to your

15  left, right?

16  A.    It made a left turn on to Medgar Evars.

17  Q.    Yeah.  But he asked you where was Coleman Street, and you

18  said it's kind of across the street over towards the left,

19  right, at an angle?  Didn't you say that?

20  A.    Correct.  Yes, sir.

21  Q.    So that car, it came straight down Coleman Street at a

22  leftward angle to you?

23  A.    No, sir.  It approached Coleman --

24  Q.    Okay.

25  A.    -- straight, correct?
```

1   Q.   Coming toward -- in your direction but at an angle,

2   right?

3   A.   Correct.

4   Q.   All right.

5   A.   I can look across.  If I'm looking across from where I'm

6   sitting, the front and the driver's side is what's in my view.

7   When the vehicle makes the turn, now the passenger side is on

8   my view.

9   Q.   So is that the point where you saw the discolored door,

10  when it turned in your direction?

11  A.   After acknowledging the fact that the driver didn't have

12  a seat belt on.

13  Q.   Oh.  Only after, right?

14  A.   Correct.

15  Q.   But you knew you knew this car, right?

16  A.   Once it passed.

17  Q.   Well, actually, once it turned?

18  A.   Well, yes.

19  Q.   And you are a detective, right?

20  A.   Yes, sir.

21  Q.   But you say you were patrolling the -- what's the word

22  you used?  Can you explain to us why you were monitoring

23  traffic as a detective?

24  A.   Well, as a narcotics detective, I mean, we sit all the

25  time.  We sit at major intersections just monitoring traffic.

1   We see something, seat belt violation or something that's out

2   of place, it's not uncommon for a detective to patrol the

3   area.

4   Q.  And is that because, as a result of these stops, you

5   uncover narcotics; is that right?

6   A.  Yes, sir.

7   Q.  So you're saying you look for probable cause or some

8   basis to stop somebody and hopefully, as a narcotics

9   detective, you find narcotics; isn't that right?

10       MR. ALLEN:  Objection.

11       THE COURT:  What's your basis of your objection?

12       MR. ALLEN:  Getting beyond the scope of this traffic

13    stop at issue.  I -- I'll withdraw the objection at this

14    time, Your Honor.

15       THE COURT:  You may proceed.

16   BY MR. TANNER:

17   Q.  So you're hoping to observe probable cause so that you

18   can follow up and try to find narcotics because you are a

19   narcotics detective, right?

20   A.  Yes, sir.

21   Q.  All right.  And you know as a seasoned officer with JPD,

22   you have to have some form of probable cause before you stop

23   somebody, right?

24   A.  Yes --

25       MR. ALLEN:  Your Honor, objection.  That misstates the

```
 1      legal standard for a traffic stop.
 2              MR. TANNER:  One, it's what he knows; and two --
 3              THE COURT:  Objection overruled.
 4              MR. TANNER:  Okay.
 5      BY MR. TANNER:
 6      Q.   Your understanding is that you need probable cause to
 7      make the stop, right?
 8      A.   Yes, sir.
 9      Q.   All right.  But you don't always have probable cause when
10      you stop people, do you?
11      A.   No, I had to have PC.
12      Q.   What do you mean you had to have PC?
13      A.   I have to have probable cause.
14      Q.   And if you don't have probable cause, then what?
15      A.   I'm not stopping anyone.
16      Q.   Right.  Because if you stop somebody without probable
17      cause, even if you find all these narcotics that fit within
18      your job as a narcotics detective, you know the case can't go
19      forward legitimately, right?
20      A.   Correct.
21      Q.   Now, you are from Brookhaven, right?
22      A.   Yes, sir.
23      Q.   When did you come to Jackson?
24      A.   2009.
25      Q.   So you were well into adulthood when you came to Jackson?
```

```
 1   A.   Yes, sir.
 2   Q.   Are you familiar with the phrase "jump out boys"?
 3   A.   Yes, sir.
 4   Q.   Tell the Court what that is.
 5   A.   That is a term that the streets deem that police officers
 6   that work in, say, like narcotics or a street crimes unit,
 7   they go to areas and they may jump out, jump out on
 8   individuals who may possibly be involved in drugs or any type
 9   of criminal element.
10   Q.   Okay.  But it was well before this adulthood you told us
11   about, well before you moved to Jackson, that you had heard of
12   the jump out boys, right?
13   A.   Yes, sir.
14   Q.   When did you first hear about the jump out boys?
15   A.   I can't give you a specific time.
16   Q.   All your life pretty much, right?  You knew about the
17   jump out boys all your life, right?
18   A.   I would guess.
19   Q.   Now, sir, you know I sued you, and you know I've deposed
20   you.  Do you want me to --
21   A.   Oh.
22   Q.   Yeah.  You look different.  I look a little different.
23   You know I sued you, and you know you've said you've known
24   about the jump out boys your whole life, right?
25   A.   I mean, if this what you saying.
```

1    Q.   Okay.  So before you came to Jackson, you knew what (sic)

2    the jump out boys, right?

3    A.   Right.

4    Q.   Now, you said the streets came up with jump out boys.

5    Tell us what your understanding of what the jump out boys do

6    that make them the jump out boys.

7    A.   The term is in the -- in the title.

8    Q.   Explain it to us.

9    A.   Well, as I explained before, narcotics or street

10   crime-level units, they may go into different areas.  Again,

11   if it's narcotics being sold in an area or just a high-crime

12   area, those units go out and if they PC on whatever crimes or

13   they see anything, pretty much, they jump out.

14   Q.   Anything.  Anything meaning less than PC, right?

15        MR. ALLEN:  Your Honor, I want to lodge an objection.

16    I'm trying to let the parties freely ask questions, but it

17    seems we are getting beyond the scope of the hearing -- the

18    issue before the Court, which is the propriety of a traffic

19    stop for a seat belt violation and what the officer observed

20    about that.

21        THE COURT:  What's your response, Mr. Tanner?

22        MR. TANNER:  I'm still asking about PC.  I'm asking how

23    this PC works, probable cause, his probable cause --

24        THE COURT:  I'll give you some leeway.

25        MR. TANNER:  Yes, sir.

BY MR. TANNER:

Q.   All right.  So the jump out boys are titled that because

often they jump out on people even when they don't have PC;

isn't that right?

A.   No, sir.  I mean, you can get out and conduct a field

interview.  There is nothing wrong with me approaching

somebody and asking, Hey, what do you have going on?

Q.   So isn't it true, sir, that you sometimes go to these

areas that you consider high crime with Medgar Evars -- the

area where you were poached up during your narcotics detective

activities on the date in question, is that a high-crime area

sir?

A.   Yes, sir.

        MR. ALLEN:  Objection.  Relevance.

        THE COURT:  Objection overruled.

BY MR. TANNER:

Q.   That is a high-crime area, right?

A.   Yes, sir.

Q.   The sort of area where the jump out boys do this jumping

out that you described to us, right?

A.   Yes, sir.

Q.   And, now, you referenced this notion of an investigation

concerning a Butthead Gang, right?

A.   Yes, sir.

Q.   Now, you know that Mr. McCroy -- well, Mr. McElroy,

1    excuse me, has a now deceased brother who went by the nickname

2    Butthead, right?

3    A.   Yes, sir.

4    Q.   And you knew that prior to the day you stopped him,

5    right?

6    A.   Yes, sir.

7    Q.   And you knew that prior to seeing the discolored door on

8    that Toyota Avalon, didn't you?

9    A.   Yes, sir.

10   Q.   Now, when you as -- so you have been a part of the jump

11   out boys; isn't that accurate?

12       MR. ALLEN:  Object.

13   A.   I have been a part of narcotics.

14   BY MR. TANNER

15   Q.   All right, sir.  You've seen this transcript quite a bit

16   since we made it, haven't you?

17   A.   Yes, sir.

18   Q.   A lot of people have approached you with this transcript

19   before, right?

20   A.   Yes, sir, they have.

21   Q.   Now, you said you've been with JPD now 15 years?

22   A.   Yes, sir.

23   Q.   How long have you been a sergeant, sir?

24   A.   2023.

25   Q.   Just a little over a year, perhaps?

```
 1   A.   Yes, sir.

 2   Q.   How long have you been a detective?

 3   A.   For nine, nine years.

 4   Q.   Okay.  Now, were you the jump out -- I mean, do you still

 5   use this jump-out tactic that you told me about back in 2018?

 6        MR. ALLEN:  Would you -- could I ask that you repeat

 7     the question?

 8        MR. TANNER:  Yes, sir.

 9   BY MR. TANNER:

10   Q.   Do you still use this jump-out tactic that you told me

11   about back in October 4th, 2018?

12   A.   Do we still go to high-crime areas and --

13   Q.   Jump out of cars, yes, sir.

14   A.   Yes, sir.

15   Q.   And were you doing that at the time period during which

16   you arrested Mr. McElroy?

17   A.   No, sir.  It was just me and Detective Warren Hull on

18   that day.

19   Q.   Was your department, the narcotics section of JPD, still

20   doing jump-out activities at that time?

21   A.   No, sir.  We didn't -- as far as manpower, no.  We were

22   just -- if we don't look at -- go out and look at locations,

23   we just go to areas and just pretty much patrol and work.

24   Q.   Okay.  So there was a gap in the jump-out activities.

25   Like jump out -- there was a freeze in that for a while, and
```

1    now you're back doing the jump-out activity; is that what

2    you're telling me?

3    A.   Yes, sir.

4    Q.   And this just happened to be the time period when you

5    arrested Mr. McElroy that y'all had a freeze on the jump-out

6    activities; is that right?

7    A.   Yes, sir.

8    Q.   Now, wouldn't you admit, sir, that sometimes when you did

9    these jump-out activities, you did it without actually seeing

10   a crime?  It was just primarily because you were in this

11   high-crime area?

12   A.   If we are speaking --

13        MR. ALLEN:  Objection.  Relevance.

14   A.   -- on the ground of a field interview --

15        THE COURT:  Hold on.

16        MR. ALLEN:  Maybe I'd make it a continuing objection to

17   relevance of questions along these lines, but --

18        THE COURT:  We need to focus in on what happened that

19   day.

20        MR. TANNER:  Yes, Your Honor.  And may I respond just

21   so the record is clear?  My issue is, I think it's fairly

22   obvious, I am saying here that this was a jump-out activity,

23   that this man saw Darrius McElroy and the specific highly

24   distinguishable vehicle that he was in that day and

25   initiated blue lights without having seen --

1          THE COURT:  You're being given permission to try to

2     develop your record on it.

3          MR. TANNER:  Yes, Your Honor.

4     BY MR. TANNER:

5     Q.   But isn't it true, sir, that sometimes when you are doing

6     this kind of jump-out activity, you don't have a particular

7     suspect or crime in mind, but you just know that this is a

8     high-crime area, so you jump out, right?

9     A.   If it comes to -- if we run across individuals in that

10    area that may just be -- just, like, say, for instance, a gas

11    station.  If they are hanging out at a gas station, of course,

12    you know, some gas stations do have no loitering; some don't.

13    So, you know, just going to an area, if there are a lot of

14    crimes that have occurred at this one gas station, we'll go

15    and we'll get out.  Like I said, there is nothing wrong with

16    conducting a field interview.

17    Q.   Okay.  And you are getting out fast.  You are not -- I

18    mean, that's why you say you are jumping out, right?  You

19    didn't say you just politely get out of you vehicle.  You

20    actually jump out.  You whip in and jump out on them, right?

21    A.   Depending on that area, if we have prior knowledge of the

22    individuals in that area to say maybe this group is known to

23    have firearms, if the police come in kind of casual, the

24    individuals may run or they may actually decide they want to

25    harm law enforcement, so it depends on the area.

```
 1   Q.   All right.  And this is one of those high-crime areas,
 2   like you said, right?
 3   A.   Yes, sir.
 4   Q.   And this is a person that you knew and had an active
 5   investigation on, right?
 6   A.   Correct.
 7   Q.   So you were aware of this man when you decided to blue
 8   light him, right?
 9   A.   I didn't know if that was him driving the vehicle.  As I
10   stated before, the year prior, I couldn't identify if it was
11   him then either.
12   Q.   A year prior in the Toyota Avalon?
13   A.   Correct.
14   Q.   In fact, you knew it wasn't him, right?
15   A.   The year prior?
16   Q.   Wasn't it two different people?  Wasn't James Harris the
17   driver and another gentleman was the passenger, these two
18   people you said you saw in the Toyota Avalon on that day?
19   A.   My -- my outlook of it, it was Mr. Harris.  The
20   sergeant's outlook, it was Mr. McElroy.
21   Q.   Okay.  So the sergeant --
22   A.   Michael Martin.
23   Q.   Michael Meyers, right?
24   A.   Martin.
25   Q.   Michael Martin?
```

```
 1    A.    Yes, sir.

 2    Q.    Okay.  According to Michael Martin, it was LaKendrick

 3    Harris, right, the driver; isn't that right?

 4    A.    I would have to --

 5    Q.    If I showed you a copy of a document, might that refresh

 6    your recollection?

 7    A.    Yes, sir.

 8              MR. TANNER:  May I approach and have this marked?

 9              THE COURT:  Show it to the other side.

10              MR. ALLEN:  Over Government's objection.

11              THE COURT:  What's the Government's objection?

12              MR. ALLEN:  Relevance, Your Honor.

13              THE COURT:  Objection overruled.

14              MR. TANNER:  May I approach the witness, Judge?

15              THE COURT:  You may.

16    BY MR. TANNER:

17    Q.    Sir, I'm handing you Defendant's Exhibit 1.  I'm asking

18    you to please look at that and see if that refreshes your

19    recollection as to who the supervisor said was the driver and

20    the passenger in that two-person vehicle, this same Toyota

21    Avalon, in the incident you referenced as a year prior.

22    A.    This says -- you want me to read it?

23    Q.    No.  Does it remind you of who it is?

24    A.    Oh.  Okay.

25    Q.    All right.  Sir, you can put that down for a second.
```

```
 1   Sir, who was the driver referenced when you said you saw two

 2   people in the vehicle?  Who did your supervisor say the driver

 3   was?

 4   A.   James Edward Harris.

 5   Q.   And who was the passenger, the second person in this

 6   two-person occupied vehicle, that same Toyota Avalon?

 7   A.   LaKendrick Harris.

 8   Q.   So James Harris and LaKendrick Harris; is that right?

 9   A.   Yes, sir.

10   Q.   Who did you detectives charge?

11   A.   No -- I don't -- no one was charged with anything from

12   that vehicle.

13   Q.   Are you sure?

14   A.   From my recollection, I don't recall charging anyone.

15        MR. TANNER:  May I approach, Judge?

16        THE COURT:  You may.

17        MR. TANNER:  May I approach to have this marked, Judge?

18        THE COURT:  Yes, you may.

19   BY MR. TANNER:

20   Q.   Sir, I'm handing you Defendant's Exhibit 2.  Now, sir,

21   you told us it was LaKendrick and James Harris, those were the

22   two people that were occupying that vehicle that day.  And

23   that date you're talking about was June 15, 2020; isn't that

24   right?

25   A.   Correct.
```

```
 1   Q.   Who was charged with possessing the drugs and the firearm

 2   that was in that vehicle on June 15th, 2020?

 3   A.   I guess Darrius McElroy.

 4   Q.   Darrius McElroy?

 5   A.   Correct.

 6   Q.   Not one of the two people that was in the -- y'all

 7   charged Darrius McElroy when your reports say Darrius McElroy

 8   wasn't even in the vehicle; isn't that right?

 9   A.   Yes, sir.  But I don't think these charges were valid.  I

10   don't know whether they actually went through.  I don't know

11   whether they dismissed them later or what, but --

12   Q.   Why was he charged with a crime you all knew he didn't

13   commit, sir?

14   A.   I didn't -- I didn't say that he was in the vehicle.

15   Q.   Is that not a charge for Darrius McElroy for the event

16   that your other supervisor said he wasn't even there?

17   A.   Yes, sir.

18   Q.   All right.  May I have that, please?

19   A.   Uh-huh.

20   Q.   So you say you don't know if this is a valid charge.

21   Isn't there a signature of a Jackson Municipal Court judge,

22   June Hardwick, on here?

23   A.   Yes, sir, it is.

24   Q.   Isn't there a file stamp saying "Received" from the city

25   clerk's department where y'all put these felony charges on
```

1  this man for an incident where Exhibit 1 says he wasn't even

2  there?

3  A.   Yes, sir, that's what it says, but --

4  Q.   And these are all members of your narcotics detective

5  team, right?

6  A.   Yes, sir.

7  Q.   And y'all work jointly and collectively on these

8  narcotics activities, right?

9  A.   Not necessarily.

10  Q.   Okay.  So --

11  A.   If I work better with another detective, I will work with

12  that detective.  We -- if we are going to do something as a

13  group, it will either be going to those high-crime areas or

14  doing a search warrant.

15  Q.   Okay.  How many of you narcotics detectives were working

16  this June 15th, 2020, operation?  I believe that was the DART

17  unit; was it not?

18  A.   I can't recall, sir.

19  Q.   Okay.  Tell the Court what the DART unit is.

20  A.   Direct action response team, I believe is -- the DART

21  team duties were a lot -- they work special events.  They were

22  a patrol unit that actually went to high-crime areas and got

23  out.

24  Q.   What special event was going on on June 15th of an area

25  of Newport Street when y'all were arresting these two men and

1    charging this man with it?  What special event was over there?

2    A.   None.

3    Q.   Okay.  Can you explain to the Court -- you can turn to

4    His Honor and explain -- why y'all -- your department charged

5    Darrius McElroy with a crime your reports say he didn't

6    commit?

7    A.   Like I said, I don't think he was charged on it.  I think

8    -- I mean, the paperwork is signed, but there is a booking

9    court services that the charges can also be dismissed.  So I

10   never identified Mr. McElroy there.

11   Q.   So is that a tactic of your department, sir, where you

12   charge them because, hey, we'll just put a felony on somebody

13   because we know it can be dismissed later?  Is that part of

14   what you do?

15   A.   No, sir.  I can't explain what the next person does.

16   Q.   And I asked you if y'all work collectively.  That is sort

17   of how the narcotics department works.  You work together,

18   right?  Meaning you and Martin were actually on the scene, but

19   Bailey went and filed the report; isn't that correct?

20   A.   The report or the --

21   Q.   I mean the charging documents that charged this man with

22   a felony he didn't commit.

23   A.   I can't explain to you who gave him that order or how he

24   came up with that conclusion, sir.

25   Q.   So he just -- but the point is y'all work together,

1  right?  I mean, isn't that right?

2  A.   Correct.

3  Q.   So you say an order.  Somebody would have had to order

4  him to put charges, because Bailey wasn't there when y'all

5  made the arrest, right?

6  A.   I can't recall.

7  Q.   But you are saying somebody in the narcotics unit would

8  have had to tell him to put these bogus charges on

9  Mr. McElroy; isn't that right?

10  A.   Yes, sir.  He would have had to get it from somewhere.

11  Q.   But tsk-tsk because it might be dropped is what you say?

12  A.   No.  What I'm saying is that I didn't identify

13  Mr. McElroy that day.  I didn't.

14  Q.   Right.  Did you know that these charges had been filed

15  against Mr. McElroy?

16  A.   No, sir.

17  Q.   Not until I just showed you the document?

18  A.   Yes, sir.

19  Q.   How far had your investigation into this so-called

20  Butthead Gang been going on prior to your stopping Mr. McElroy

21  in this case?

22       MR. ALLEN:  Another objection.  Relevance.

23       THE COURT:  Objection overruled.

24  A.   I can't even recall when we started -- JPD started a gang

25  unit.  I think there had been a lot of shootings in that area,

1   and I just can't recall how long it had been going on.

2   BY MR. TANNER:

3   Q.   How long had you been involved in that?

4   A.   Like I said, it was a newly formed gang unit, so maybe

5   five to six months, I guess.

6   Q.   So for five or six months, you had been looking into a

7   gang named after Mr. McElroy's older then deceased brother,

8   right?

9   A.   Yes, sir.

10  Q.   So you -- what kind of activities did you have looking

11  into Mr. McElroy prior to you stopping him in the vehicle that

12  you knew from a year prior?

13  A.   Can you -- when you say "activities," what do you --

14  Q.   Like, what sort of law enforcement steps did you take --

15  I mean, you knew you were looking for this man or looking into

16  this man on the day you stopped him, and just happenstance is

17  what you want us to believe, you happened to see him in a car

18  with no seat belt, right?

19  A.   Yes, sir.

20  Q.   Just happenstance, even though you knew you had been

21  looking into this man and his friends or what have you for

22  five months, right?  That's the story, right?

23  A.   Well, again, I didn't know who was driving the vehicle.

24  Like I said, all I saw was the driver not wearing a seat belt.

25  He had a white shirt on.  No -- no shoulder strap.

1  Q.   Had you seen Mr. McElroy in that vehicle prior to that

2  day?

3  A.   No, sir.

4  Q.   Never?

5  A.   No, sir.

6  Q.   Okay.  You never had a conversation with Mr. McElroy

7  about that vehicle and tell him you were looking for James or

8  none of that?  That never happened?

9  A.   No.  My first time meeting Mr. McElroy was that day.

10 Q.   You had been looking into Mr. McElroy.

11 A.   Uh-huh.

12 Q.   You had identified Mr. McElroy.

13 A.   Correct.

14 Q.   And you just happened upon a man who happened to be

15 Mr. McElroy, right?

16 A.   Yes, sir.

17 Q.   You had never met Mr. McElroy prior to that day?

18 A.   No, sir.

19 Q.   Well, how did you know it was Mr. McElroy?

20 A.   I had came up with a spreadsheet or a -- what do you call

21 it?  A PowerPoint.

22 Q.   A PowerPoint?

23 A.   Yes, sir.  And we had individuals identified that were

24 possibly a part of this Butthead Gang, so we're trying to make

25 sure that the individuals that we were receiving information

1    from were actually those people, and we already had a photo of

2    him in our system from a prior arrest.

3    Q.    When did you put the PowerPoint together?

4    A.    Some time during the investigation.

5    Q.    You hadn't deleted it as of today, have you?

6    A.    No, sir.

7    Q.    Now, this PowerPoint, is there writing on it?  Meaning

8    did you type anything on the PowerPoint?

9    A.    Yes, sir.

10   Q.    All right.  So it's a writing of sorts; isn't that right?

11   A.    Yes, sir.

12   Q.    And it's relevant to whether and how you knew Mr. McElroy

13   on the day in question, right?

14   A.    Only thing that -- only information that we had, that

15   supposedly or allegedly he was the leader of the Butthead

16   Gang.

17   Q.    Okay.  So you just happened upon -- did you happen upon

18   anybody else related to the Butthead Gang in the five months

19   that you were working on it, or was this just your lucky day

20   with Mr. McElroy?

21   A.    No, sir.  He was the only one -- Mr. Harris was a part of

22   that as well, but I never ran across Mr. Harris.

23   Q.    Okay.  Now, sir, did you have any kind of -- or does

24   JPD's narcotics unit have any kind of recording equipment on

25   your person or on your vehicles?

1    A.    During that time, we did not.

2    Q.    You do now?

3    A.    We did not during that time.  Yes, sir, we do now.

4    Q.    As of when did you have -- did you start?  Which one do

5    you have now?  Do you have body-worn cameras or --

6    A.    We had the body-worn cameras then.  We don't have dash

7    cam.

8    Q.    Do you have dash cam now?

9    A.    Yes, sir.  Well, they are putting them in vehicles now.

10   Q.    So you still -- you don't operate a vehicle that has a

11   dash cam yet; is that right?

12   A.    Yes, sir, I don't have one.

13   Q.    But on the day you arrested Mr. -- or sought to arrest or

14   stop Mr. McElroy, you had a body-worn camera?

15   A.    Yes, sir.

16   Q.    Is that pursuant to JPD policy?

17   A.    I'm sorry?

18   Q.    Did you wear that --

19   A.    Yes, sir.

20   Q.    -- as -- pursuant to or as a directive of JPD policy?

21   A.    Yes, sir.

22   Q.    Was yours functioning that day?

23   A.    It was.

24   Q.    Do you have a video showing the incident?

25   A.    The video, how the G-Tag system works, there are four

1  categorization -- four categories, rather.  You have felony,

2  misdemeanor, traffic stop, and citizen interaction.  If it's

3  not a felony, the felony lasts for some years.  If it's filing

4  a misdemeanor, it's only like some months.

5  Q.   What's that got -- do you have it or not?  I'm confused.

6  A.   No, sir.  It's not -- once those months pass, it's out of

7  the cloud.

8  Q.   But you charged him with a felony, didn't you?

9  A.    Initially.  We hadn't went inside the vehicle or

10  anything.  It was just an abandoned vehicle with traffic

11  violations, which was a misdemeanor.  The felony aspect came

12  once we conducted a search warrant on the vehicle.

13  Q.   How long was that?

14  A.   The same night.

15  Q.   Okay.  So you charged him with a felony the same day,

16  right?

17  A.   Right.  The camera footage remained on during -- while we

18  were at the 2857 Newport address.  Once the vehicle was towed,

19  everything was done, the camera went off and I went and did

20  the warrant.

21  Q.   So the camera was on the entire time from the time you

22  say you observed him with no seat belt all the way up through

23  you finding him?

24  A.   The camera came on once I turned my blue lights on.

25  Q.   Oh.  Right after you saw the -- the no seat belt?

```
 1   A.   Correct.

 2   Q.   All right.  Well, at that point, you got the camera on.

 3   You started it when you activated your blue lights, right?

 4   A.   Correct.

 5   Q.   And it stayed on until after you claim you found

 6   felony-level contraband?

 7   A.   No, sir.  The camera stayed on until we left the

 8   residence.  I turned the camera off and went to headquarters

 9   and did the warrant.

10   Q.   To go in the car?

11   A.   Yes, sir.

12   Q.   Did you turn it back on because you knew that there was

13   felony-level items in the car?

14   A.   I didn't know that.

15   Q.   You never saw anything contraband-wise in the vehicle; is

16   that fair?

17   A.   No, sir.

18   Q.   Nothing was in plain view?

19   A.   No, sir.

20   Q.   None of your reports say that y'all saw anything in plain

21   view?

22   A.   Not to my recollection.

23   Q.   At what point -- you mentioned these four categories for

24   your cameras.

25   A.   Yes, sir.
```

1   Q.  At what point does that get input as a misdemeanor,

2   felony, or citizen interaction or whatever the fourth one is

3   you said?

4   A.  You yourself turn to the categories.

5   Q.  So you have that authority to decide right then on the

6   scene, misdemeanor?

7   A.  Or felony or traffic stop or citizen interaction.

8   Q.  Even though the investigation wasn't over and even though

9   you had a larger investigation into the Butthead Gang,

10   presumably for felony-level offenses, right -- you mentioned

11   killings and shootings and all this other stuff -- you turned

12   it to misdemeanor, which would have made the footage last only

13   so long, right?

14   A.  Yes, sir.  Like I said, during -- once the vehicle was

15   towed from 2857 Newport.  I did it as a misdemeanor because

16   that's all I had at the time.  Like, I could smell marijuana

17   coming from inside the vehicle, but I don't know whether he

18   had just smoked in there or what, so...

19   Q.  And you -- and in order to get that warrant, you had to

20   sign an affidavit, did you not?

21   A.  Yes, sir.

22   Q.  And that affidavit would have had to describe a crime to

23   the court that issued the warrant, right?

24       MR. ALLEN:  Objection, Your Honor.  Beyond the scope of

25     the motion at this point.

```
 1          MR. TANNER:  I'll move on.
 2          THE COURT:  All right.
 3   BY MR. TANNER:
 4   Q.   Sir, before I -- let me go back to that one more time.
 5   On this camera, when you turned it to misdemeanor, what effect
 6   did that have on how long the video would be preserved?
 7   A.   Now, that's something you may have to ask Chief Vincent
 8   Grizzell.  That's who is over the camera system.
 9   Q.   No, but you said that if it's a misdemeanor, it's so
10   long.
11   A.   Oh.
12   Q.   If it's a felony, it's longer.
13   A.   Uh-huh.
14   Q.   You already gave us the time frames.  Give me that
15   misdemeanor time frame again.
16   A.   I think it's only for, like, a few months, some months or
17   so.  It's not longer than, of course, the felony.
18   Q.   So you had -- but you had developed a felony offense
19   within hours of clicking to misdemeanor and ensuring that that
20   video would only last for about six months; isn't that right?
21   A.   With what I initially had leaving Newport, it was an
22   abandoned vehicle.
23   Q.   That's fair.  But later that night, not even 24 hours
24   passed when you knew this had gone from misdemeanor to felony;
25   isn't that right?
```

```
 1   A.   So can I ask a question?  Are you trying --
 2        THE COURT:  Wait.  Answer his question first.
 3        THE WITNESS:  Okay.
 4   BY MR. TANNER:
 5   Q.   All right.  Before 24 hours had passed, you knew this had
 6   risen from a misdemeanor to a felony, right?
 7   A.   Yes, sir.
 8   Q.   And you -- this isn't your first time bringing cases
 9   through the federal courts that start out as local crimes that
10   you are going to charge in Hinds County Circuit Court,
11   perhaps, and that these cases are often brought to federal
12   court, right, like gun cases and whatnot, right?
13   A.   Yes, sir.
14   Q.   All right.  So you knew that you had set this material,
15   this critical material, this recording, to last only a couple
16   of months, but you knew within hours that this might be in
17   federal court later or even in circuit court as a felony,
18   right?
19   A.   After leaving Newport.
20   Q.   All right.  That same night?
21   A.   Yes, sir.
22   Q.   Did you take any steps -- knowing that this might need to
23   last a whole lot longer than misdemeanor-level six months, did
24   you take any steps to ensure that this critical evidence was
25   preserved, sir?
```

1    A.    Again, leaving Newport, it was a misdemeanor.

2    Q.    Yeah.  But leaving Newport the second time, you knew good

3    and well -- or leaving the -- wherever y'all got done the

4    search warrant, you knew it had shifted from a misdemeanor to

5    a felony; isn't that right?

6    A.    Yes, sir.

7    Q.    And you knew that anybody who had to defend themselves

8    from any of this felony stuff that you put on them, that they

9    would have a right to see the camera footage.  Otherwise

10   there's no point in recording it; isn't that right?

11   A.    I know that as a defense attorney, you would want to look

12   at the camera --

13   Q.    As a citizen of this country, if you were charged,

14   wouldn't you want to have access to the recording?

15   A.    Yes, sir.

16   Q.    As opposed to just listening to a cop from a department

17   and a section of a department that puts false charges on

18   people?  Wouldn't you want to have it, sir?  Don't you think

19   that's reasonable?

20   A.    Yes, sir.

21   Q.    Okay, then.  So you had a duty to go and preserve that

22   evidence, did you not?

23   A.    Again, from Newport to when I did the warrant, once I

24   categorized it as misdemeanor on --

25   Q.    You could have changed it, right?

1    A.    No, you cannot.  Once it's categorized and the camera

2    stops, that camera footage, whenever it's uploaded -- or

3    placed on the dock, it's uploaded.  So when you go back and go

4    into something else, then, yes, you have the option to put,

5    again, felony, misdemeanor, citizen interaction, or traffic

6    stop.  So it doesn't continue on once it stops.  That footage

7    is that footage.

8    Q.    You could have downloaded it just as easy as you uploaded

9    it.  Who are you kidding, sir?  Isn't that true?

10    A.    I don't --

11    Q.    You could have downloaded it.

12    A.    I don't have access to download it, sir.

13    Q.    You could have asked Grizzell to download -- excuse me,

14    Chief -- Deputy Chief -- I don't remember his title.  You

15    could have asked somebody in the department to download it so

16    that this man could have a preserved version of the evidence,

17    right?

18    A.    Yes, sir.

19    Q.    You could have easily done that, right?

20    A.    Yes, sir.

21    Q.    All right.  Now, in addition to that, sir, you said the

22    camera started recording whenever you turn your dash -- your

23    sirens or lights on; isn't that right?

24    A.    No, sir.

25    Q.    All right.  Tell me how it works.

1   A.   You have to push the button.

2   Q.   You push the button?

3   A.   Yes, sir.

4   Q.   And what does the button do?  Start record- -- capturing?

5   A.   It starts the camera.  To take a picture, you have to

6   double-tap it.

7   Q.   Okay.  Double-tap to take a picture.  What starts the

8   video?

9   A.   The pushing -- there's a button in the middle.  You push

10   the button.

11   Q.   Okay.  What happens when you push the button?

12   A.   It will tell you recording.

13   Q.   All right.  Have you ever faced this thing and seen how

14   it works, like meaning is it like a -- is it like a camera

15   shutter where it's closed and then when you hit the button, it

16   opens, or --

17   A.   No, sir.

18   Q.   It's always open like where I can see the lens?

19   A.   Yes, sir.

20   Q.   Is this one of the sorts of camera apparatuses where when

21   I start the recording, because it's on a continuous basis, it

22   would have recorded -- I withdraw that.

23        MR. TANNER:  May I rephrase?

24        THE COURT:  You may.

25   BY MR. TANNER:

```
 1   Q.   You are familiar with dash cams, how some dash cams, when
 2   you hit the record button, it actually is running all the time
 3   so it captures --
 4   A.   Some but before?
 5   Q.   Yeah.
 6   A.   Yes, sir.
 7   Q.   Is that how this body cam works?
 8   A.   Yes, sir.
 9   Q.   All right.  So if you hit the body cam as soon as you
10   turned your lights on, how much of the time prior to you
11   hitting it would it have captured?
12   A.   It's some seconds.  I can't --
13   Q.   How many seconds?
14   A.   It's some seconds before it actually starts.
15   Q.   And when you decided to blue light this man after he made
16   the left turn, you say, it was only seconds -- you blue
17   lighted him only seconds after he made the turn, right?
18   A.   Okay.
19   Q.   Is that right?
20   A.   Yes, sir.
21   Q.   And it was second -- during those seconds that you could
22   have obviously seen because of the white shirt that he had had
23   no seat belt on; isn't that your testimony?
24   A.   Yes, sir.  When he crossed me coming from Coleman, I
25   observed that there was no seat belt on.
```

1    Q.   And so if it would have -- if you triggered it as soon as

2    you hit your blue lights or as soon as you decided to engage

3    him, if those seconds where you claim you could have seen him

4    with no seat belt on were captured in that spillover footage

5    from prior to you hitting the button, if you had provided that

6    or kept it or made it felony level, we wouldn't have to just

7    rely on your word; we could actually see the video footage of

8    whether he was wearing a seat belt or not, because that's what

9    this whole thing is about, right?

10   A.   Depending on placement of the camera.

11   Q.   Okay.  And where was the placement of the camera?

12   A.   Center -- center mass.

13   Q.   And can you say for certain whether it would have

14   captured it or whether it did capture it or not?

15   A.   With it being center mass on me, it would have caught the

16   steering wheel and the dash.

17   Q.   So the rest of it would have only caught the steering

18   wheel and the dash; is that what you're saying?

19   A.   Yes, sir.

20        THE COURT:  The steering and dash of which vehicle?

21        THE WITNESS:  Of my vehicle.

22        THE COURT:  Okay.

23   BY MR. TANNER:

24   Q.   So it wouldn't have been helpful to either one of us?

25   A.   No, sir.

1    Q.   So why did you turn it on?

2    A.   I still had to turn it on.  That's -- our policy is if

3    you are about to engage in something or if you are walking up

4    to somebody, you have to turn it on before making actual

5    contact.

6    Q.   All right.  And we have to even now rely on your word on

7    that because you say so and because the video is gone, right?

8    A.   That's what we have.

9    Q.   Now, because you found -- because you smelled weed -- or

10   marijuana, excuse me, and because you did the search warrant

11   and found what you say is contraband, you wrote a report on

12   this incident, right?

13   A.   Yes, sir.

14   Q.   But isn't it true that a lot of times when you all do

15   these jump-out activities and stop citizens in high-crime

16   areas, if you don't, for example, find anything, you don't

17   write a report at all, right?

18   A.   If there's nothing found.

19   Q.   So there will be no record of you having stopped people

20   without probable cause, right?

21   A.   No, sir.  That's, again, a field interview.

22          MR. TANNER:  I pass the witness, Judge.

23          MR. ALLEN:  Briefly, Your Honor.

24          THE COURT:  All right.

25                    **REDIRECT EXAMINATION**

1   **BY MR. ALLEN:**

2   Q.   Sergeant Williams, you were asked a moment ago about the

3   positioning of your body cam when you are inside the cruiser

4   and what a body camera captures and what it doesn't.  Have you

5   had an opportunity throughout the course of your career to

6   review body cam footage that captures -- that is recording

7   things while you are inside your cruiser?

8   A.   Yes, sir.  You have instances where, say, again, you can

9   push it and it catches those few seconds, and then you have

10  moments where people forget to turn their body camera off and

11  you catch quite a bit.

12  Q.   In those instances when the body cam is initiated inside

13  of a cruiser and the body cam's situated about where it was on

14  your body on July 21st, what does the camera typically

15  capture?

16  A.   If it's center mass where they typically want us to have

17  it, it's going to catch everything, if, like -- the steering

18  wheel or either the dashboard.  But you have some officers

19  that may put it up here.  That's not where they want it, but

20  they pretty much put it wherever -- wherever they can on their

21  vest or their uniform.

22  Q.   And at the inception of this traffic stop on July 21st,

23  again, did you know the identity of the person that you saw

24  driving that vehicle?

25  A.   I did not.

1          MR. ALLEN:  That's all, Your Honor.

2          MR. TANNER:  Your Honor, may I offer those two exhibits

3      into evidence?

4          THE COURT:  D1 and D2?

5          MR. TANNER:  Yes, sir.

6          THE COURT:  Any objection?

7          MR. ALLEN:  No, Your Honor.

8          THE COURT:  All right.  D1 and D2 will be received in

9      evidence.

10          (Defendant's Exhibit 1-2 entered in evidence.)

11          MR. TANNER:  May I approach Ms. Summers to hand them?

12          THE COURT:  Yes.

13                              **EXAMINATION**

14  **BY THE COURT:**

15  Q.   I have a couple of follow-up questions, and then I'll let

16  the Government follow behind me and then Mr. Tanner -- and

17  that person -- I'm just trying to figure out your location and

18  all of that --

19  A.   Yes, sir.

20  Q.   -- where you were stationed.  You were on -- were you at

21  a convenience store?

22  A.   Yes, sir.

23  Q.   Okay.  And you were -- the convenience store's address is

24  Medgar Evars?

25  A.   I think it should be 3710 Medgar Evars.

1  Q.  I mean, it was on -- you were on Medgar Evars?

2  A.  Yes, sir.

3  Q.  Your car was facing Medgar Evars?

4  A.  Yes, sir.

5  Q.  Okay.  And if you turned right, because your car was

6  facing -- if you turned right, you would be going north on 49?

7  A.  If I'm sitting facing Medgar Evars in the gas station --

8  in the convenience store parking lot, if -- you said if I turn

9  right?  Yeah.  If I turn right, I'm going north toward 49.

10  Q.  Okay.  You are going 49 north.

11  A.  Yes, sir.

12  Q.  Okay.  So the -- so how far were you from Ridgeway?  Was

13  Ridgeway the next block?

14  A.  No.  Ridgeway was --

15  Q.  Was right there?

16  A.  Yes, sir.

17  Q.  Okay.  So you were at Medgar Evars and Ridgeway.

18  A.  Yes, sir.  You know when it comes to the intersection of

19  Ridgeway and Medgar Evars, when you cross over Medgar Evars,

20  it turns over into Coleman Avenue.  That goes off into the

21  Hollywood area.  I think Elraine is down off in there, so you

22  are facing west.  You are in the convenience store parking

23  lot.  Ridgeway is right here.  It's that gas station right at

24  the corner of Ridgeway and Medgar Evars.

25  Q.  And the vehicle, the Camry was -- the Avalon, excuse

1  me --

2  A.   It was coming east on Coleman Avenue, so it made a left

3  turn going north, so it crossed my field of view.

4  Q.   So the vehicle -- if Ridgeway ran both ways, Ridgeway

5  changes from Ridgeway to Coleman at Medgar Evars, basically?

6  A.   Yes, sir.

7  Q.   Okay.  So the Avalon was coming up Coleman?

8  A.   Yes.  It was traveling east on Coleman and got to the

9  light.  When the light changed, it made the left turn and

10  crossed my field of view.  That way I could have a clear view

11  of the front windshield.

12  Q.   Okay.  And if it made a left, was it making a left or

13  Medgar Evars, or was it going --

14  A.   It was making a left on to Medgar Evars.

15  Q.   It was making a left on Medgar Evars?

16  A.   Yes, sir.

17  Q.   Okay.  And it continued to make -- it continued to go up

18  Medgar Evars?

19  A.   Yes, sir.

20  Q.   Okay.  And when did you put on your blue lights?

21  A.   Once I noticed that the driver didn't have his seat belt

22  on, he drove, I pulled out, I advised Detective Hull what I

23  had, and I turned my blue lights on.

24  Q.   Okay.

25  A.   I turned my blue lights on before I got to Rutledge

1   Avenue, which is the next intersection up.

2   Q.   The next intersection is Rutledge?

3   A.   Yes, sir.

4   Q.   And then the vehicle turned -- the vehicle must have

5   turned -- taken a right then?

6   A.   Well, it passed Liberty Street, which would be on the

7   left side.

8   Q.   Uh-huh.

9   A.   Because Liberty doesn't cross over.

10  Q.   Okay.

11  A.   So once you pass Liberty, you have Sunset, because you

12  know Sunset goes across.

13  Q.   Right.

14  A.   So it made the right turn on to Sunset.

15  Q.   He took a right on Sunset.  So your blue lights were put

16  on way back -- well, not way back, but were put back on at the

17  time that you were at the convenience store?

18  A.   Yes, sir.

19  Q.   He went about a stoplight, at least?  Is that a stoplight

20  there?

21  A.   Yeah, it's a stoplight at Medgar Evars and Sunset.

22  Q.   Okay.  When -- but before getting to that stop sign,

23  there was another street, right?

24  A.   Well, two streets.  It was Rutledge and then you have

25  Liberty.

```
1    Q.   Okay.  Rutledge and Liberty.

2    A.   And then Sunset.

3    Q.   And never stopped --

4    A.   No, sir.

5    Q.   -- at Rutledge or Liberty, took a right on Sunset, and

6    ended up going -- continuing to go, correct?

7    A.   It passed O Bannon, which is the street to the -- it

8    would have been the first street to the right.  Then it went

9    to Newport.  That's when it slowed down and made the right

10   turn on to Newport.

11   Q.   Okay.  And I think Mr. Tanner was questioning you about

12   an affidavit made against Mr. McElroy.  I believe that was --

13        THE COURT:  Was that D1, Mr. Tanner?

14        MR. TANNER:  Yes, Your Honor.

15        THE COURT:  Ms. Summers has not marked it yet.

16        MR. TANNER:  I'm sorry, Your Honor?

17        THE COURT:  Was that D1?

18        MR. TANNER:  Yes, Your Honor.

19        THE COURT:  No.  It's D2, then.  I'm sorry.  That's D2.

20   BY THE COURT:

21   Q.   That affidavit was from the year prior, right?

22   A.   Yes, sir.

23   Q.   Okay.  And I think Mr. Tanner asked you about charges

24   being filed against Mr. McElroy and later being dismissed.

25   A.   Because he -- I don't understand how he could have been
```

1    charged, because from me being out there, I never saw him out

2    there that day.

3    Q.   But that would have been the date from the year before,

4    right?

5    A.   The year before, yes, sir.

6    Q.   Now, the only way one can dismiss something, it has to be

7    filed first, right?

8    A.   Yes, sir.

9    Q.   Okay.  So you all went as something was dismissed, right?

10   A.   I'm not aware if it was -- well, I --

11   Q.   Oh.

12   A.   With him being arrested on my warrants, those warrants

13   would have also shown up.  They -- those warrants weren't

14   there, so that's why I'm -- they possibly had to be dismissed

15   because, again, I can't attest to Mr. McElroy being on scene

16   that year prior.

17   Q.   Okay.  Well, I'll let Mr. Tanner then explain to me.

18   Okay.  All right.

19        And what time of day was this when you saw the vehicle

20   come off of Coleman?  What time was -- what time of day was

21   it?

22   A.   6:00, close to 7:00.  So it was still -- it was still

23   daylight.

24   Q.   And going back to the angle and vision of yours, the car

25   was headed in the eastern direction on Coleman, took a left on

1  Medgar Evars.  At that -- at the time that it took the left on

2  Medgar Evars, the passenger side of the car would have been

3  closest to you, right?

4  A.  Yes, sir.

5  Q.  All right.  And at that moment, did you recognize the

6  vehicle?

7  A.  Yes, sir.  Once I looked at the door, it was like, That's

8  the vehicle we had the pursuit with the year prior.

9  Q.  Okay.  Is that when you decided to put on your blue

10  lights?

11  A.  Well, when I saw that he didn't have the seat belt on and

12  once the vehicle passed, I'm, like, that's the vehicle from

13  last year.  I got out and turned my blue lights on.

14  Q.  So it was a combination of seeing the door and the --

15  A.  The seat belt violation, as well as recognizing the

16  vehicle once it passed.

17  Q.  Would you have engaged your blue lights if you did not

18  see the passenger door?

19  A.  Well, no.  If I had not saw the passenger door, no, I was

20  still going to pull him over because he didn't have a seat

21  belt on.

22  Q.  Oh, okay.

23      THE COURT:  All right.  The Government may follow up

24  with any questions that it might have.

25      MR. ALLEN:  Very briefly, Your Honor, on this question

```
 1      of daylight.

 2                    CONTINUED REDIRECT EXAMINATION

 3   BY MR. ALLEN:

 4   Q.   What time of year was this?

 5   A.   Around the same -- this same time of year.

 6   Q.   Was this July of 2021?

 7   A.   It was July.

 8   Q.   So the summer months?

 9   A.   Yes, sir.

10   Q.   So this is late 6:00 in the evening?

11   A.   Yes, sir.

12   Q.   And I understand you say it was still daylight outside?

13   A.   It was.

14        MR. ALLEN:  That's all, Your Honor.

15        THE COURT:  All right.  Thank you.

16        Mr. Tanner?

17        MR. TANNER:  May it please the Court?

18                        RECROSS-EXAMINATION

19   BY MR. TANNER:

20   Q.   His Honor started off asking you questions about the

21   orientation of the driving and where you were situated and all

22   that.  Do you recall that?

23   A.   Yes, sir.

24   Q.   Now, I have reviewed your report, sir.  Can you tell the

25   Court why it is that when you write these reports are you so
```

1    detailed about what streets were involved and which direction

2    you and the other people turned?

3    A.   It's a detailed report.

4    Q.   Yeah.  But why specifically about the direction of travel

5    and when people turned and what direction they turned and what

6    streets they were on?  Why are you so detailed about those

7    points?

8    A.   Well, I mean, he didn't -- he didn't pull over.  The

9    vehicle didn't stop.

10   Q.   No.  I'm saying isn't it important to note the streets so

11   that courts or the defendants or prosecutors can see what

12   streets and what angles people were driving on?

13   A.   Yes, sir.

14   Q.   That's important, right?

15   A.   Yes, it is.

16   Q.   Especially in a case involving you having to follow

17   somebody, it's critical to note what streets they were on,

18   when they were on those streets, and how they got there; isn't

19   that right?

20   A.   Yes, sir.

21   Q.   And direction of travel, right?

22   A.   Yes, sir.

23   Q.   All right.  And you do -- in your reports about

24   Mr. McElroy's activities on July 31st, 2021, you are careful

25   to mention all these streets that he was on, right?

1    A.    Yes, sir.

2    Q.    All right.  Because it's important for the Court to know,

3    for example, that you were at the intersection of Medgar Evars

4    and Ridgeway, right?

5    A.    Yes, sir.

6    Q.    It's important for the Court to notice that you got

7    behind Mr. McElroy at Medgar Evars and Rutledge, right?

8    A.    Yes, sir.

9    Q.    That he turned right on to Newport Street as opposed to

10   left, right?

11   A.    Yes, sir.

12        MR. TANNER:  May I approach, Judge?

13        THE COURT:  You may.

14   BY MR. TANNER:

15   Q.    Sir, I'm handing you a copy of the report that you wrote.

16   You're 1922?

17   A.    Yes, sir.

18   Q.    All right.  A report that you wrote on July 31, 2021.  Do

19   you recognize that as your report, sir?

20   A.    Yes, sir.

21   Q.    Is that a true and accurate depiction of your report just

22   on my computer screen?

23   A.    Yes, sir.

24   Q.    Were the side windows of -- were the side windows of this

25   Avalon tinted?

A.   I can't recall, sir.

Q.   You need him to be on Coleman, don't you?

A.   You said I need him to be on Coleman?

Q.   Your story doesn't work as well unless he's coming straight towards you on Coleman, right, and making a turn in front of you so you can see through the big windshield, right? Your story doesn't work as well unless he was on Coleman across the street, right?

A.   That's where he was.

Q.   All right.  Where is that in your report?  In this detailed report where you mention all the left turns and the right turns, tell this Court in which paragraph you reference him being on Coleman.

A.   I do not.

Q.   It's important for him to be on Coleman because that's when the windshield would have been facing you, because your report says he was driving north on Medgar Evars.  Never says anything about him being on Coleman, does it?

A.   I didn't see the violation across the street.  I saw it once he turned and went north.

Q.   You didn't say he turned left on to Medgar Evars.  You say -- if I am to read your report, when you saw this man, he was driving north on Medgar Evars Boulevard, and that's when you noticed it, if I read your report, not what you showed up here to say today?  Right?

```
 1           MR. ALLEN:  Objection.  Argumentive.

 2           MR. TANNER:  I'm asking him.

 3           THE COURT:  Hold on.  Objection overruled.  You can

 4      just -- you can lower the tone.

 5           MR. TANNER:  I'm sorry, Judge.

 6           THE COURT:  The volume.  The volume.

 7           MR. TANNER:  I apologize, Judge.

 8  BY MR. TANNER:

 9  Q.   When's the first report you wrote where you said this man

10  was on Coleman?

11  A.   This is my report.

12  Q.   So since 2021, you have never said in court or written in

13  any report or any affidavits for any search warrant that this

14  man was on Coleman?

15  A.   No, sir.

16  Q.   Every report you have ever written related to this case

17  says you saw him driving up Medgar Evars, north on Medgar

18  Evars; isn't that right?

19  A.   That's when I saw the violation.

20  Q.   All right.  So the first time we hear about Coleman is

21  today; is that right?

22  A.   Yes, sir.

23  Q.   So you don't mention him turning -- now, you told this

24  Court -- so you told this Court that he was turning off of

25  Coleman.
```

1  A.   Yes, sir.

2  Q.   When he was making the turn, he had this white shirt on.

3  That's when you were able to see the no seat belt, right?

4  A.   Yes, sir.

5  Q.   So if this Court goes with your reports and excises the

6  fact that you claim this man was on Coleman, then there was no

7  incident for him to turn on left where you can see through

8  this big windshield that he had no seat belt on blocking this

9  white T-shirt, right?

10  A.   He is headed north.

11  Q.   Yeah.  You don't say anything about Coleman, him turning

12  left on Coleman where he is across the street from you and you

13  can see through this windshield.  You didn't say that in your

14  report, did you?

15  A.   No, sir.

16  Q.   Nor your affidavit for a search warrant, did you?

17  A.   No, sir.

18  Q.   First time you said that in any kind of legal proceeding

19  concerning this man was here, right, today?

20  A.   Yes, sir.

21  Q.   Did you tell the Government about the Coleman piece?

22  A.   Yes, sir, I told my attorney.

23  Q.   All right.  When did you tell them that?

24  A.   When we met in reference to this hearing.

25  Q.   But you never told anybody else about the Coleman piece,

1   not any city court judge, not anybody who issued a warrant for

2   this man or none of that, right?

3   A.    No, sir.

4   Q.    Coleman is just here now with us today, right?

5   A.    Yes, sir.

6         MR. TANNER:  Pass the witness.  Judge, may I supplement

7      the record?  I just have a printout of that --

8         THE COURT:  Is G -- is this Government 000048?

9         MR. TANNER:  Yes, sir.

10        THE COURT:  That's part of --

11        MR. TANNER:  They attached it to their response.

12        THE COURT:  -- Document Number 35, Exhibit A, I guess.

13        MR. TANNER:  Yes, sir.

14        THE COURT:  Exhibit 1?  35-1?

15        MR. ALLEN:  Correct, Your Honor.  I believe that's

16     right.

17        THE COURT:  All right.  It's already part of the

18     record.  The Court will make it a part of this proceeding.

19     And that will be your D3?

20        MR. TANNER:  Yes, sir.

21         (Defendant's Exhibit 3 entered in evidence.)

22        THE COURT:  Okay.  Let me.  I'm sorry.  I do have

23     one -- you mentioned an affidavit, Mr. Tanner, an affidavit

24     for a search or an arrest.  Is that part of this record?

25        MR. TANNER:  It's not, Your Honor, but I have a copy.

1    I'll have to scroll through here.  I didn't print that one

2    out, but it looks very similar to -- I can find it, Judge,

3    in just a few moments with the Government's Bates stamp

4    numbers if the Court -- give me just a second.

5        I have it here, Judge.  It's Government-26 -- Bates

6    stamped 26.  I apologize.

7        THE COURT:  Okay.  It's not part of any filing so far,

8    right?

9        MR. TANNER:  It's not, Judge, but I did reference it

10   during my questioning.

11       THE COURT:  Okay.  We don't have that because the

12   parties have not given that document to the Court, but I

13   would like to see it.

14       MR. TANNER:  Yes, sir.  Can I offer it as

15   Government's -- I mean Defendant's 4?  Sorry I didn't have a

16   printout of that.

17       THE COURT:  Okay.  But it's -- it is -- what is it

18   titled?  It's --

19       MR. ALLEN:  Your Honor, I have a physical copy --

20       THE COURT:  You do?

21       MR. ALLEN:  -- that I could offer to the Court for

22   review.

23       THE COURT:  Okay.  Thank you.  Could you provide it,

24   Mr. Allen?

25       MR. ALLEN:  Yes, sir.  Bear with me just a moment, Your

```
 1    Honor.  Trying to get the --
 2         THE COURT:  All right.  Go ahead and show it to
 3    Mr. Tanner first.
 4         MR. ALLEN:  Yes, Your Honor.
 5         THE COURT:  I see you're about to.
 6         MR. ALLEN:  Your Honor, for the record, with the
 7    Court's permission, I will approach with what has been
 8    marked in discovery as Government-26, Government-30, and
 9    Government-36.
10         THE COURT:  Okay.
11         MR. ALLEN:  May I approach, Your Honor?
12         THE COURT:  Is there something wrong?
13         We'll take a 15-minute recess and you can provide that
14    to me.
15         MR. ALLEN:  Yes, Your Honor.
16         THE COURT:  Right.  We'll take a recess.
17                        (A recess was taken.)
18         THE COURT:  You may be seated.
19         Okay.  I have Government -- excuse me, Defendant
20    Exhibit 4, which is Government Bates stamps number 26, 30,
21    and 36.  It appears to be the same document, underlying
22    facts and circumstances in support of an affidavit for a
23    search warrant.
24         MR. ALLEN:  Your Honor, I think the documents look very
25    similar.
```

1      THE COURT:  They look similar, but they are different.

2      MR. ALLEN:  Very similar.  It's three slightly

3  different affidavits, but it's setting forth the same sort

4  of thing, the same facts and circumstances.

5      THE COURT:  Right.

6      MR. TANNER:  The reason -- they were used for different

7  purposes.

8      THE COURT:  Okay.  All right.

9      MR. ALLEN:  That's right.  One was for a search warrant

10  for the car, another a search warrant for a computer, and I

11  think the other one for a bench arrest warrant.

12      THE COURT:  Thank you.  Thank you.  But that is D4.  D3

13  is the field case report, the Government Bates stamps 44

14  through 50.  And the field case report includes the

15  narrative.

16      (Defendant's Exhibit 4 entered in evidence.)

17      THE COURT:  All right.  The Government -- do you have

18  any other witnesses?

19      MR. ALLEN:  No, Your Honor, the Government does not.

20      THE COURT:  The Government rests?

21      MR. ALLEN:  The Government rests, Your Honor.

22      MR. TANNER:  The defense rests, Judge.

23      THE COURT:  All right.  Do the parties wish to make any

24  argument on the motion?

25      MR. ALLEN:  The Government does, Your Honor.

```
 1            THE COURT:  All right.
 2            MR. ALLEN:  Briefly.
 3            THE COURT:  Okay.
 4            MR. ALLEN:  May I proceed, Your Honor?
 5            THE COURT:  You may.
 6            MR. ALLEN:  As the Court knows, the traffic stop is a
 7     seizure, and a two-part inquiry applies:  whether officer's
 8     actions were justified at inception or whether the officer's
 9     actions reasonably related in scope to the circumstances
10     that justified the interference in the first place.  Here
11     the issue, whether the officers's actions were justified at
12     the inception, that's what we are looking at here with the
13     traffic stop and whether any evidence should be suppressed
14     after the occurrence of the traffic stop.
15            So the question's raised:  How is a traffic stop
16     justified at its inception?  Well, an officer needs only
17     reasonable suspicion that some sort of illegal activity
18     occurred, including a traffic violation.  We know from the
19     Southern District of Mississippi that failure to wear a seat
20     belt is a traffic violation and an appropriate basis for
21     stopping a vehicle.
22            Two decisions for the -- or two -- yeah, two decisions
23     from this circuit I'd cite for the Court.  One is U.S.
24     versus Thomas.  That was before Judge Bramlette.  That's
25     Criminal Number 5:20-cr-10.  The Westlaw citation is 2021 WL
```

1    5173618 from the Southern District of Mississippi, November

2    5, 2021.

3        Another is a fairly recent decision that I was involved

4    in, *U.S. versus Moore.*  That's Criminal Number 3:23-cr-75.

5    That was before Judge Wingate.  In docket entry 37 on

6    April 17, 2024, he denied a motion to suppress.  Part of the

7    basis for that motion to suppress involved an officer seeing

8    a seat belt violation and disputing the facts as to whether

9    the person was or was not wearing a seat belt.

10        In a case like this, and the *Thomas* decision from Judge

11    Bramlette points this out, the decision for the Court is a

12    credibility determination for the officer, whether he saw --

13    whether he had a reasonable suspicion when he saw a seat

14    belt violation or what he thought to be a seat belt

15    violation.

16        I would like to point out for the Court that from the

17    Second and Seventh Circuit that even if the officer's belief

18    was incorrect, even if they were incorrect, they thought

19    they saw a seat belt but they were incorrect, that's a

20    mistake of fact, not a mistake of law.  The failure to wear

21    your seat belt is a violation, so even if an officer thought

22    they saw a seat belt violation but that wasn't true, that's

23    a mistake of fact, and even then the question is whether the

24    mistake of fact was reasonable or not.  And this is what

25    prompted my objection earlier about probable cause and the

1    correct legal standard.  It's a reasonable suspicion

2    standard here that applies when an officer is viewing a

3    driver of a vehicle and he or she makes a determination

4    about whether someone is wearing a seat belt.  That Seventh

5    Circuit case is *U.S. versus Dowthard*, D-O-W-T-H-A-R-D, 500

6    F.3d 567, Seventh Circuit, 2007.

7        Sergeant Williams stated that when he saw the driver

8    not wearing a seat belt, he did not know who that driver

9    was, that any body cam that may have been activated, even if

10   it had been activated at the time that he makes an

11   observation of no seat belt violation, it would not have

12   caught what his field of vision did.

13       The defense has pointed out that the particular street,

14   I think it was Coleman Street, that defendant came from,

15   drove off of and turned on to Medgar Evars, that -- defense

16   has made a point that that particular detail was not

17   included in the narrative descriptions of the report and in

18   the affidavits that are before the Court.

19       The Government would submit that that omission of that

20   detail is not fatal to Sergeant Williams' testimony before

21   the Court.  It does not -- it's not fatal to his

22   credibility, that his account of what he saw should stand.

23   And the issue for the Court is whether, when he was looking

24   at that vehicle in daylight and the defendant had on a white

25   T-shirt, whether he had a reasonable belief for believing

1    that the driver was not wearing a seat belt, which leads to

2    a perfectly valid basis for a traffic stop.

3         That's all, Your Honor.

4         THE COURT:  Let me ask you this, Mr. Allen.  I'm

5    looking at his narrative, and the second sentence of his

6    narrative says, "While at this intersection, I observed that

7    the driver of a white in color Toyota Avalon was not wearing

8    his seat belt as the vehicle traveled north on Medgar Evars

9    Boulevard."

10        MR. ALLEN:  Yes, Your Honor.

11        THE COURT:  And I think what I heard today was he saw

12   the driver traveling east on Coleman, and that was his

13   testimony today, that he saw him driving east on Coleman,

14   because his windshield was facing him and he could see

15   through the windshield and see it, but here he says as he

16   was driving north on Medgar Evars, so it was after he

17   turned, according to his narrative here.  Possibly.  And if

18   the Court believes that, is it a dispute of fact or dispute

19   of credibility?

20        MR. ALLEN:  Your Honor, I noticed that particular entry

21   and that phrasing in the report as well.  And the Government

22   would submit that that particular entry is not inconsistent

23   with what the testimony was on the stand, because he

24   testified that it was, you know, as he turned left on to

25   Medgar Evars, he saw it as he was traveling north.  And he's

1 on the west -- this would be the west side of Medgar Evars.

2 Defendant is on the west side of Medgar Evars on Coleman.

3 Turns left on to Medgar Evars, which puts him going

4 northward.  And I heard Sergeant Williams to say,

5 essentially, two things:  It's as he's pulling out and

6 turning left on to Medgar Evars and traveling north on

7 Medgar Evars.

8   I do not think that the way that that is described in

9 the report is necessarily conflicting with what was stated

10 on the stand.  That's the Government's read of that, Your

11 Honor.  I noticed the same thing, and I just -- when I look

12 at that and think of the writer of that report when he is

13 drafting that and the wording he is using and then what we

14 heard from Sergeant Williams on the stand -- I also heard

15 him to say, you know, as he turned on to Medgar Evars and as

16 he was traveling north.  I know that the observation -- the

17 specific observation of the seat belt is not when the car is

18 directly in front of him, completely perpendicular to him.

19   But I won't go on and on too much.  When I read those

20 things, I do not think that they are necessarily in conflict

21 with one another, his testimony on the stand and the way you

22 see that described in the report.

23   THE COURT:  Okay.  So the driver is on the -- I guess

24 the driver -- I mean not the driver.  Excuse me.  The

25 officer's vehicle is facing east, then.

1      MR. ALLEN:  No, Your Honor.  The officer's vehicle is

2  on the east side facing west.  Defendant's vehicle is on the

3  west side facing east.

4      THE COURT:  Okay.  If I'm going south on Medgar Evars,

5  which side of the street is the officer on, according to --

6      MR. ALLEN:  The left.  The left.  So the officer -- as

7  the officer was looking at Medgar Evars --

8      THE COURT:  That's what I thought.

9      MR. ALLEN:  -- from where he's parked, to the right is

10  going north.

11      THE COURT:  Okay.  So the passenger side of the vehicle

12  that has the primed paint on it would be the right passenger

13  side of the vehicle.

14      MR. ALLEN:  Correct.

15      THE COURT:  Correct?

16      MR. ALLEN:  Correct, Your Honor.  And Sergeant Williams

17  testified that he saw the seat belt violation before he

18  noticed that -- that door.

19      THE COURT:  Okay.  All right.  Thank you.

20      MR. ALLEN:  Thank you, Your Honor.

21      THE COURT:  All right.  Thank you.  And you will have a

22  chance for rebuttal if you need it.

23      MR. ALLEN:  Thank you.

24      THE COURT:  All right.  Mr. Tanner?

25      MR. TANNER:  Your Honor, this -- this -- may it please

 1    the Court, first of all?

 2        THE COURT:  You may proceed.

 3        MR. TANNER:  All right.  This is in fact a credibility

 4    determination, and this Court has told quite a number of

 5    juries and will tell quite a number more that a cop is just

 6    like any other witness.  The fact that the person wears a

 7    badge, they undergo the same sort of review and scrutiny for

 8    credibility as any other witness would.  They are not to

 9    (sic) believe simply because they are a cop or in law

10    enforcement.  If they put forth credible testimony, then

11    they can be believed.  If they put forth incredible

12    testimony, just like any other witness, you can disregard

13    all of it.

14        Now, is there a reason to find that this officer's

15    testimony concerning the circumstances of this stop is not

16    credible?  I believe we've done quite a bit of that.

17        Number one, the jump out boys situation.  That was a

18    case that I did.  I think it was *Brian Burns verus City of*

19    *Jackson* that was filed in this court, and I believe it was

20    before Your Honor.  And in that case, as the witness

21    admitted today, he was very much part of this jump out boys.

22    He did that sort of activity in which he and other officers

23    went to what they called a high -- or, excuse me, what they

24    called high-crime areas, which he admitted this was, where

25    they looked for people that they had already known, which he

1    admits Mr. McElroy was, and they would hop out of the car

2    under this notion of field -- doing field interviews.  Now,

3    why they had to whip in on people in order to do that, I'm

4    not sure.  But I think that's their way of couching what

5    countless pieces of literature, academic and otherwise, had

6    described as infringements, gross infringements, upon

7    people's constitutional rights.

8        In fact, the officer admitted in the deposition, the

9    same as he admitted here today, that whenever they would

10   jump out on people and they didn't have evidence of any

11   crime, there would be no reporting of it.  There would be no

12   acknowledgment that these incidents had ever happened.  That

13   is a basis for finding this officer and his treatment of

14   the -- of the constitutional prohibition against violating

15   people's Fourth Amendment rights as not credible.

16       All right.  So those reports that we just put into

17   evidence, they are not put into evidence as substantive

18   evidence.  They were offered and identified for impeachment.

19   But even if -- so the Court can view them one way or the

20   other, but from an impeachment perspective, pure credibility

21   issue, Judge, it shows that in sworn affidavits as well as

22   in reports, this man has never said -- he acknowledged that

23   from the stand.  He has not once said Coleman.  This

24   happened in the middle of 2021.  It's three years later,

25   just about.  This man has never said anything about Coleman,

1    but Coleman makes his story better because he needs to see

2    this through the big window.

3        So if you don't believe the Coleman part, then he never

4    saw this man with his white shirt with the seat belt through

5    the windshield as he described it earlier.  If you don't

6    believe the Coleman part and you believe what he wrote and

7    put in front of these judges in the form of sworn affidavits

8    that led to search warrants and bench warrants and charging

9    instruments in state court, then he would have been driving

10   north on Medgar Evars while the cop was sitting facing west

11   on the east side of Medgar Evars.  He would have saw --

12   or -- excuse me.  He would have seen the discolored door a

13   long time ago.  Because at that point he's in the right lane

14   driving north on Medgar Evars, and if he's on the east side

15   of the street, he would have seen that.

16       So we're right back to my original point, which I think

17   should be obvious at this point.  This man saw who he

18   thought to be Darrius McElroy and stopped him, a man he

19   happened to be investigating with a PowerPoint that I have

20   yet to see, which is a writing under Rule 16, a PowerPoint

21   where he is looking for Darrius McElroy, the so-called

22   leader of some gang.  No violent criminal history or none of

23   that, but he is supposedly the leader of some gang, and he

24   just so happens upon him.  Well, the Coleman story that he

25   says for the first time three years after the incident, it

1    makes it better because I couldn't see over there who it was

2    and I didn't know until after following this man all this

3    time.

4        And when we get back to these reports that never once

5    mention Coleman -- it's not, Oh, well, in the hurried nature

6    of writing reports -- it's not that, Judge.  That first

7    report that I put into evidence, that is why I asked him

8    about all the turns, all the streets.  The level of detail.

9    I can do big murder cases in Hinds County and not see a

10    four-page report.  And we fail to mention Coleman?  Other

11    than the place where he stopped him, during his testimony

12    today, all we heard was the first street, Medgar Evars, and

13    the street where he stopped.  It took him forever to get to

14    all the streets he turned on, but those were the ones that

15    were important for the report.  That's a basis for

16    questioning his credibility.

17        So just because he's a cop coming in here saying

18    something that his reports never said, the fact that this

19    man had a recording, who is he supposed to be?  I guess I

20    got to take his word for it:  If we had the recording, it

21    would only show the dashboard.  Says who?  In this building,

22    it happens all the time.  Every -- not everybody, but enough

23    people in this building act like, well, a cop said it; I'm

24    supposed to take it.  Well, a jury is not even supposed to

25    do that.  Who is he to say?  Oh, well, Tarik Williams said

1   so; I guess we better go home.

2       This man and his counsel, we do not have to take his

3   word for it.  He's supposed to provide that.  Well, if he is

4   telling the truth, we wouldn't have to rely on it.  My

5   argument would be dead in the water if he did the recording

6   he claims he did and preserved it in the way the law

7   requires him to do so.  The fact that he didn't is a basis

8   for questioning for his credibility.  And the issue here is:

9   If he doesn't -- I haven't even read those cases, but I'm

10  pretty sure two things happened, the cases that were cited

11  here from this court:  A, they said there was a traffic stop

12  and, B, the judges found them credible.  Not just that a cop

13  said there was a no seat belt offense.  It was that

14  perhaps -- perhaps the cops in those cases weren't jump out

15  boys.  I really don't know.  Perhaps the cops in those cases

16  actually had evidence preserved that they claimed in court

17  that they had but weren't able to produce it.  Perhaps those

18  cops in-court testimony matched what their reports say.

19      This is just like those cases they file where there was

20  a soft accusation that I'm here for discovery purposes.  I

21  didn't ask for any discovery here.  This was always from the

22  outset a credibility issue.  They are citing cases that

23  don't actually cover what we're here for.  I wasn't trying

24  to have a suppression hearing for discovery.  I'm

25  challenging this man's credibility.  Same thing.

1        I bet you none of those cases have the issues -- Judge

2   Bramlette and Judge Wingate were not likely to have been

3   confronted with the testimony that this Court has.  Did any

4   of those show up with a 200-page deposition or a 100-page

5   deposition about some jump out boys where this same witness

6   admitted to violating people's constitutional rights?  I

7   doubt it.  I bet those opinions don't mention that.  Do they

8   involve missing audio recordings of the very thing that

9   should have shown that this stop was valid unquestionably?

10  I imagine not.

11       But, I mean, the Government's argument is that a

12  traffic stop is a -- I mean, a no seat belt is a violation.

13  We concede that.  I mean, that's not worth arguing.  Of

14  course it is.  This is a credibility issue.  Of course it

15  is.  They won't address these points.  Not, oh, well, I see

16  the report is being this or that.  No.  Why would his report

17  contain that level of four pages of detail, which turns he

18  made, were they right, were they left, was he driving,

19  north, south, east, or west, and omit the all-important

20  driving west -- or, excuse me, driving east on Coleman?

21  Why?  Why would that critical detail be left out?  Because

22  it's bogus, the Court could conclude.

23       Unless the Court has questions for me, Judge, that's

24  all I have.

25       THE COURT:  I don't think I have any questions for you,

1    Mr. Tanner.

2        MR. TANNER:  Yes, Your Honor.

3        THE COURT:  Any rebuttal?

4        MR. ALLEN:  Briefly, Your Honor.

5        Your Honor, on the point about *Moore* and *Thomas*, the

6    two decisions cited before the Court, *Moore* was definitely a

7    he said/she said situation between the officer and the

8    defendant and whether it was true that the officer had seen

9    a seat belt violation or not, because in that particular

10   case, it occurred at night and the officer observed it from

11   the rear, and so that was very much at issue, and there has

12   even been an issue in that case about body cam and dash cam

13   and it no longer having been retained with Vicksburg Police.

14       *Thomas*, less familiar with because I didn't personally

15   litigate that, but if my recollection's --

16       THE COURT:  Slow down.

17       MR. ALLEN:  With *Thomas* I'm not as familiar with

18   because I did not personally litigate that case, but if my

19   recollection is right on reviewing the case, it very much is

20   an issue of he said/she said between the officers and the

21   defendant.

22       I want to point out this idea about Sergeant Williams

23   not having included the Coleman detail in his report and

24   defendant's being -- and it is their job to do what they are

25   doing, but really holding its feet to the fire.  I would

 1    like to point out that this traffic stop occurred at

 2    6:45 p.m.  That narrative is dated -- on July 31st.  That

 3    narrative is dated July 31st.  The affidavits are dated

 4    July 31st.  The Government submits that's a lot of policing

 5    and a lot of work in a 24-hour period, and perhaps he did

 6    omit that detail in a report, but that's a lot of policing,

 7    a lot of working in an evening.

 8        I noticed that the defense -- they are saying a lot of

 9    things to attack the credibility of Sergeant Williams.  What

10    they are not saying is he wouldn't be able to see a seat

11    belt violation.  That argument is not being made before the

12    Court.  A lot of other arguments are, but he is not saying,

13    "He wouldn't be able to see that.  I was wearing it."  We

14    are not hearing that.

15        Your Honor, the Government submits Sergeant Williams'

16    testimony is credible.

17        THE COURT:  But he specifically testified that he saw

18    the seat -- he saw it through the windshield.

19        MR. ALLEN:  Correct.

20        THE COURT:  It would have been different if he said I

21    saw it through the side window, because it would have

22    been -- the car would have been going up Medgar Evars going

23    north.  And he could say that he saw the white T-shirt and

24    didn't see a lap belt, didn't see a harness across on that

25    side.  But he didn't testify to that.  He said as he was

coming, I saw it through the big windshield.  He had on a
white shirt, and I could see that he didn't have on a seat
belt.  If he had testified that I saw it -- I saw it as he
was traveling north, the Court could still buy that, right?

MR. ALLEN:  Still buy what, Your Honor?

THE COURT:  I mean, that he saw it, that he would have
seen that he was unbelted.  Because he said -- he testified
that he didn't recall -- I think he testified he didn't
recall whether or not the window was tinted, but assuming
the window was not tinted, as he drove by, he could have
seen through the passenger side window that the driver did
not have on a seat belt, could he not?

MR. ALLEN:  Well, what -- he doesn't recall -- as I
appreciated Sergeant Williams' testimony, he doesn't recall
whether he saw it through the side window or not.  He is not
testifying --

THE COURT:  Right.  He said he saw it through the
windshield.

MR. ALLEN:  That's right.

THE COURT:  And the only way that he would have seen it
through the windshield is if the person was coming -- going
east on Coleman.

MR. ALLEN:  And turning -- and turning left to go north
on to Medgar Evars, because the street is to his left.  So I
think it's true that the defendant's coming east on Coleman,

1    turning left on to Medgar Evars.  I think two statements are

2    true.

3        THE COURT:  Okay.

4        MR. ALLEN:  He can see it as he is traveling east

5    coming on to Medgar Evars, and he can see it as he is

6    traveling north on to Medgar Evars because he is turning on

7    Medgar Evars to travel north.  I think both of those things

8    are true.  If you were sitting facing straight ahead and a

9    street is slightly to your left and you are looking through

10   the front windshield of a car, I think it's true that you

11   see through that front windshield as they turn -- for the

12   defendant as he turns left on Medgar Evars and travels

13   north, I think it's a true statement to say he can see the

14   seat belt through the front windshield in that scenario.

15       THE COURT:  Okay.  All right.

16       MR. ALLEN:  Any other questions, Your Honor?

17       THE COURT:  No, no.  Thank you, Mr. Allen.

18       All right.  The Court will take this matter under

19   advisement, and hopefully I'll let the parties know in due

20   course how I rule on this matter.  I think currently the

21   matter is on the docket I think for July trial setting.

22   It's on the docket.  I realize there's no speedy trial

23   violation right now because we have this motion pending.

24   I -- again, I hope to get something out in due course, even

25   if that calls for the parties coming back in and the Court

1    giving an oral ruling.

2        Right now we are going to adjourn this matter.  The

3    court reporter and other court members probably have some

4    other duties that they have to attend to, so I don't want to

5    hold anybody up.  But for now, the Court is going to take

6    this under advisement and give you a ruling in short order,

7    hopefully.

8        With respect to -- we have a pretrial conference

9    scheduled in this matter.  You have -- I don't know if you

10   received the notice yet, but typically the pretrial -- this

11   case is set on the docket for July 1, I believe.  The

12   notices are going out in a minute or two, in a day or two.

13       MR. TANNER:  I received mine, Judge, last week.

14       THE COURT:  Okay.  You received yours already.  Can the

15   parties tell me now, are they ready for trial?

16       MR. TANNER:  No, Your Honor.

17       THE COURT:  Okay.  If you will --

18       MR. ALLEN:  The Government would not oppose a motion to

19   continue if that were to be --

20       THE COURT:  If the parties will send me an agreed order

21   so that you won't have to be here, because I am holding

22   pretrial conferences with some of the parties in other

23   cases.

24       MR. TANNER:  Yes, Your Honor.

25       THE COURT:  So if you will, send me an agreed order of

```
 1    continuance and we'll get it entered.

 2         MR. TANNER:  Yes, Your Honor.

 3         THE COURT:  But I hope to get your ruling in due

 4    course.

 5         MR. TANNER:  Yes, Your Honor.

 6         THE COURT:  All right.  Is there anything else we need

 7    to take up?

 8         MR. ALLEN:  No, Your Honor.

 9         THE COURT:  All right.  Thank you.  The Court is now

10    adjourned.

11                   (Court adjourned at 12:10 p.m.)

12    ***************************************************************

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**COURT REPORTER'S CERTIFICATE**

I, Caroline Morgan, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically reported by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 15th day of July, 2024.


/s/ Caroline Morgan, CCR

Caroline Morgan CCR #1957
Official Court Reporter
United States District Court
Caroline_Morgan@mssd.uscourts.gov